CALIFORNIA BREWERS ASSN. ᴇᴛ ᴀʟ. *v.* BRYANT ᴇᴛ ᴀʟ.

No. 78–1548.  Argued November 27, 1979—Decided February 20, 1980

Stewart, J., delivered the opinion of the Court, in which Burger, C. J., and White and Rehnquist, JJ., joined. Marshall, J., filed a dissenting opinion, in which Brennan and Blackmun, JJ., joined, *post*, p. 611. Powell and Stevens, JJ., took no part in the consideration or decision of the case.

*Willard Z. Carr, Jr.*, argued the cause for petitioners. With him on the briefs were *Michael D. Ryan, Aaron M. Peck, George Christensen, James R. Madison,* and *William F. Alderman.*

*Roland P. Wilder, Jr.*, argued the cause for respondent unions as respondents under this Court's Rule 21 (4), urging reversal. With him on the briefs were *David Previant, George A. Pappy,* and *Robert D. Vogel.*

*James Wolpman* argued the cause for respondent Bryant. With him on the brief was *Michael P. Goldstein.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General McCree, Assistant Attorney General Days, Richard A. Allen, Leroy D. Clark, Joseph T. Eddins,* and *Beatrice Rosenberg.**

---

*\*J. Albert Woll* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Gerald A. Rosenberg, John B. Jones, Jr., Norman Redlich, William L. Robinson,* and

MR. JUSTICE STEWART delivered the opinion of the Court.

Title VII of the Civil Rights Act of 1964 [1] makes unlawful, practices, procedures, or tests that "operate to 'freeze' the status quo of prior discriminatory employment practices." *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 430. To this rule, § 703 (h) of the Act, 42 U. S. C. § 2000e–2 (h), provides an exception:

> "[I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race. . . ."

In *Teamsters* v. *United States,* 431 U. S. 324, 352, the Court held that "the unmistakable purpose of § 703 (h) was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII . . . even where the employer's pre-Act discrimination resulted in whites having greater existing seniority rights than Negroes." [2]

The present case concerns the application of § 703 (h) to a particular clause in a California brewery industry collective-bargaining agreement. That agreement accords greater benefits to "permanent" than to "temporary" employees, and the

---

*Richard T. Seymour* for the Lawyers' Committee for Civil Rights Under Law; and by *Jack Greenberg, James M. Nabrit III, Barry L. Goldstein, O. Peter Sherwood, Daniel B. Edelman, Vilma S. Martinez,* and *Morris J. Baller* for the NAACP Legal Defense and Educational Fund, Inc., et al.

*Bruce A. Nelson, Raymond L. Wheeler, Robert E. Williams,* and *Douglas S. McDowell* filed a brief for the Equal Employment Advisory Council as *amicus curiae.*

[1] 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*

[2] *United Air Lines, Inc.* v. *Evans,* 431 U. S. 553, extended this holding to preclude Title VII challenges to seniority systems that perpetuated the effects of discriminatory post-Act practices that had not been the subject of a timely complaint. See also *Teamsters* v. *United States,* 431 U. S., at 348, n. 30.

clause in question provides that a temporary employee must work at least 45 weeks in a single calendar year before he can become a permanent employee. The Court of Appeals for the Ninth Circuit held that the 45-week requirement was not a "seniority system" or part of a "seniority system" within the meaning of § 703 (h). 585 F. 2d 421. We granted certiorari to consider the important question presented under Title VII of the Civil Rights Act of 1964. 442 U. S. 916.

## I

In 1973, respondent Bryant (hereafter respondent), a Negro, filed a complaint in the United States District Court for the Northern District of California, on behalf of himself and other similarly situated Negroes, against the California Brewers Association and seven brewing companies (petitioners here), as well as against several unions. The complaint alleged that the defendants had discriminated against the respondent and other Negroes in violation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, and in violation of 42 U. S. C. § 1981.[3]

The complaint, as amended, alleged that the respondent had been intermittently employed since May 1968 as a temporary employee of one of the defendants, the Falstaff Brewing Corp. It charged that all the defendant employers had discriminated in the past against Negroes, that the unions had acted in concert with the employers in such discrimination, and that the unions had discriminated in referring applicants from hiring halls to the employers. The complaint further asserted that this historical discrimination was being perpetuated by the seniority and referral provisions of the collective-bargaining agreement (Agreement) that governed

---

[3] The complaint also alleged, under 29 U. S. C. §§ 159 and 185, that the union defendants had breached their duty of fair representation by, among other things, negotiating "unreasonable privileges for some employees over others. . . ."

industrial relations at the plants of the seven defendant employers. In particular, the complaint alleged, the Agreement's requirement that a temporary employee work 45 weeks in the industry in a single calendar year to reach permanent status had, as a practical matter, operated to preclude the respondent and the members of his putative class from achieving, or from a reasonable opportunity of achieving, permanent employee status.[4] Finally, the complaint alleged that on at least one occasion one of the defendant unions had passed over the respondent in favor of more junior white workers in making referrals to job vacancies at a plant of one of the defendant employers.

The Agreement is a multiemployer collective-bargaining agreement negotiated more than 20 years ago, and thereafter updated, by the California Brewers Association (on behalf of the petitioner brewing companies) and the Teamsters Brewery and Soft Drink Workers Joint Board of California (on behalf of the defendant unions). The Agreement establishes several classes of employees and the respective rights of each with respect to hiring and layoffs. Three of these classes are pertinent here: "permanent," "temporary," and "new" employees.

A permanent employee is "any employee . . . who . . . has completed forty-five weeks of employment under this Agreement in one classification [5] in one calendar year as an employee of the brewing industry in [the State of California]." An employee who acquires permanent status re-

---

[4] In this Court, the respondent emphasizes that he has not contended that there is anything illegal in classifying employees as permanent and temporary or in according greater rights to permanent than to temporary employees. His sole Title VII challenge in this respect has been to the 45-week rule on its face and as it has been applied by the defendant unions and employers.

[5] The Agreement classifies employees into brewers, bottlers, drivers, shipping and receiving clerks, and checkers. Under the Agreement, separate seniority lists have to be maintained for each of these classifications of employees. The respondent is a brewer.

tains that status unless he "is not employed under this Agreement for any consecutive period of two (2) years. . . ." [6] A temporary employee under the Agreement is "any person other than a permanent employee . . . who worked under this agreement . . . in the preceding calendar year for at least sixty (60) working days. . . ." A new employee is any employee who is not a permanent or temporary employee.

The rights of employees with respect to hiring and layoffs depend in substantial part on their status as permanent, temporary, or new employees.[7] The Agreement requires that employees at a particular plant be laid off in the following order: new employees in reverse order of their seniority at the plant, temporary employees in reverse order of their plant seniority, and then permanent employees in reverse order of their plant seniority. Once laid off, employees are to be rehired in the reverse order from which they were laid off.

The Agreement also gives permanent employees special "bumping" rights. If a permanent employee is laid off at any plant subject to the Agreement, he may be dispatched by the union hiring hall to any other plant in the same local area with the right to replace the temporary or new employee with the lowest plant seniority at that plant.

Finally, the Agreement provides that each employer shall obtain employees through the local union hiring hall to fill needed vacancies. The hiring hall must dispatch laid-off workers to such an employer in the following order: first, employees of that employer in the order of their seniority with that employer; second, permanent employees registered in the area in order of their industry seniority; third, temporary employees in the order of their seniority in the industry; and

---

[6] An employee may also lose permanent status if he "quits the industry" or is discharged for certain specified reasons.

[7] In addition, permanent employees are given preference over temporary employees with respect to various other employment matters, such as the right to collect supplemental unemployment benefits upon layoff, wages and vacation pay, and choice of vacation times.

fourth, new employees in the order of their industry seniority. The employer then "shall have full right of selection among" such employees.

The District Court granted the defendants' motions to dismiss the complaint for failure to state a claim on which relief could be granted. No opinion accompanied this order. A divided panel of the Court of Appeals reversed, 585 F. 2d 421, concluding that the 45-week rule is not a "seniority system" or part of a "seniority system" within the meaning of § 703 (h) of Title VII. In the appellate court's view the provision "lacks the fundamental component of such a system" which is "the concept that employment rights should increase as the length of an employee's service increases." 585 F. 2d, at 426. The court pointed out that under the Agreement some employees in the industry could acquire permanent status after a total of only 45 weeks of work if those weeks were served in one calendar year, while others "could work for many years and never attain permanent status because they were always terminated a few days before completing 45 weeks of work in any one year." *Id.*, at 426–427.

The Court of Appeals concluded that "while the collective bargaining agreement does contain a seniority system, the 45-week provision is not a part of it." *Id.*, at 427:

> "The 45-week rule is simply a classification device to determine who enters the permanent employee seniority line and this function does not make the rule part of a seniority system. Otherwise any hiring policy (*e. g.*, an academic degree requirement) or classification device (*e. g.*, merit promotion) would become part of a seniority system merely because it affects who enters the seniority line." *Id.*, at 427, n. 11.[8]

---

[8] The Court of Appeals also observed that "the 45-week requirement makes the system particularly susceptible to discriminatory application since employers and unions can manipulate their manpower requirements and employment patterns to prevent individuals who are disfavored from

Accordingly, the Court of Appeals remanded the case to the District Court to enable the respondent to prove that the 45-week provision has had a discriminatory impact on Negroes under the standards enunciated in *Griggs* v. *Duke Power Co.,* 401 U. S. 424. 585 F. 2d, at 427–428.[9]

## II

Title VII does not define the term "seniority system," and no comprehensive definition of the phrase emerges from the legislative history of § 703 (h).[10] Moreover, our cases have not purported to delineate the contours of its meaning.[11] It is appropriate, therefore, to begin with commonly accepted notions about "seniority" in industrial relations, and to consider those concepts in the context of Title VII and this country's labor policy.

In the area of labor relations, "seniority" is a term that connotes length of employment.[12] A "seniority system" is a

---

ever achieving permanent status." 585 F. 2d, at 427. This danger, according to the court, is almost never present in any "true" seniority system, in which rights "usually accumulate automatically over time. . . ." *Ibid.*

[9] The Court of Appeals directed the trial court on remand to consider as well the respondent's claims under 42 U. S. C. § 1981 and 29 U. S. C. §§ 159 and 185.

[10] See 110 Cong. Rec. 1518, 5423, 7207, 7213, 7217, 12723, 15893 (1964). The example of a "seniority system" most frequently cited in the congressional debates was one that provided that the "last hired" employee would be the "first fired." Nowhere in the debates, however, is there any suggestion that this model was intended to be anything other than an illustration.

[11] See *Trans World Airlines, Inc.* v. *Hardison,* 432 U. S. 63; *United Air Lines, Inc.* v. *Evans,* 431 U. S. 553; *Teamsters* v. *United States,* 431 U. S. 324; *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747.

[12] Webster's Third New International Dictionary 2066 (unabridged ed. 1961) defines "seniority," in pertinent part, as the "status attained by length of continuous service . . . to which are attached by custom or prior collective agreement various rights or privileges . . . on the basis of ranking relative to others. . . ."

scheme that, alone or in tandem with non-"seniority" cri-
teria,[13] allots to employees ever improving employment rights
and benefits as their relative lengths of pertinent employment
increase.[14] Unlike other methods of allocating employment.
benefits and opportunities, such as subjective evaluations or
educational requirements, the principal feature of any and
every "seniority system" is that preferential treatment is dis-
pensed on the basis of some measure of time served in
employment.

Viewed as a whole, most of the relevant provisions of the
Agreement before us in this case conform to these core con-
cepts of "seniority." Rights of temporary employees and rights
of permanent employees are determined according to length of
plant employment in some respects, and according to length
of industry employment in other respects. Notwithstanding
this fact, the Court of Appeals concluded that the 45-week
rule should not be viewed, for purposes of § 703 (h), as part
of what might otherwise be considered a "seniority system."
For the reasons that follow, we hold that this conclusion was
incorrect.

First, by legislating with respect to "systems"[15] of seniority

---

[13] A collective-bargaining agreement could, for instance, provide that
transfers and promotions are to be determined by a mix of seniority and
other factors, such as aptitude tests and height requirements. That the
"seniority" aspects of such a scheme of transfer and promotion might be
covered by § 703 (h) does not mean that the aptitude tests or the height
requirements would also be so covered.

[14] See E. Beal, E. Wickersham, & P. Kienast, The Practice of Collective
Bargaining 430–431 (1972); Cooper & Sobol, Seniority and Testing Under
Fair Employment Laws: A General Approach to Objective Criteria of
Hiring and Promotion, 82 Harv. L. Rev. 1598, 1602 (1969); Aaron,
Reflections on the Legal Nature and Enforceability of Seniority Rights, 75
Harv. L. Rev. 1532, 1534 (1962).

[15] Webster's Third New International Dictionary 2322 (unabridged ed.
1961) defines "system," in pertinent part, as a "complex unity formed of
many often diverse parts subject to a common plan or serving a common
purpose."

in § 703 (h), Congress in 1964 quite evidently intended to exempt from the normal operation of Title VII more than simply those components of any particular seniority scheme that, viewed in isolation, embody or effectuate the principle that length of employment will be rewarded. In order for any seniority system to operate at all, it has to contain ancillary rules that accomplish certain necessary functions, but which may not themselves be directly related to length of employment.[16] For instance, every seniority system must include rules that delineate how and when the seniority timeclock begins ticking,[17] as well as rules that specify how and when a particular person's seniority may be forfeited.[18] Every seniority system must also have rules that define which passages of time will "count" towards the accrual of seniority and which will not.[19] Every seniority system must, moreover, contain rules that particularize the types of employment conditions that will be governed or influenced by seniority, and those that will not.[20] Rules that serve these necessary pur-

---

[16] See generally S. Slichter, J. Healy, & E. Livernash, The Impact of Collective Bargaining on Management 115–135 (1960).

[17] By way of example, a collective-bargaining agreement could specify that an employee begins to accumulate seniority rights at the time he commences employment with the company, at the time he commences employment within the industry, at the time he begins performing a particular job function, or only after a probationary period of employment.

[18] For example, a collective-bargaining agreement could provide that accumulated seniority rights are permanently forfeited by voluntary resignation, by severance for cause, or by nonemployment at a particular plant or in the industry for a certain period.

[19] For instance, the time an employee works in the industry or with his current employer might not be counted for the purpose of accumulating seniority rights, whereas the time the employee works in a particular job classification might determine his seniority.

[20] By way of example, a collective-bargaining agreement could provide that an employee's seniority will govern his entitlement to vacation time and his job security in the event of layoffs, but will have no influence on promotions or job assignments.

poses do not fall outside § 703 (h) simply because they do not, in and of themselves, operate on the basis of some factor involving the passage of time.[21]

Second, Congress passed the Civil Rights Act of 1964 against the backdrop of this Nation's longstanding labor policy of leaving to the chosen representatives of employers and employees the freedom through collective bargaining to establish conditions of employment applicable to a particular business or industrial environment. See generally *Steelworkers* v. *Weber,* 443 U. S. 193. It does not behoove a court to second-guess either that process or its products. *Porter Co.* v. *NLRB,* 397 U. S. 99. Seniority systems, reflecting as they do, not only the give and take of free collective bargaining, but also the specific characteristics of a particular business or industry, inevitably come in all sizes and shapes. See *Ford Motor Co.* v. *Huffman,* 345 U. S. 330; *Aeronautical Lodge* v. *Campbell,* 337 U. S. 521. As we made clear in the *Teamsters* case, seniority may be "measured in a number of ways" and the legislative history of § 703 (h) does not suggest that it was enacted to prefer any particular variety of seniority system over any other. 431 U. S., at 355, n. 41.

What has been said does not mean that § 703 (h) is to be given a scope that risks swallowing up Title VII's otherwise broad prohibition of "practices, procedures, or tests" that disproportionately affect members of those groups that the Act protects. Significant freedom must be afforded employers and unions to create differing seniority systems. But that freedom must not be allowed to sweep within the ambit of § 703 (h) employment rules that depart fundamentally from commonly accepted notions concerning the acceptable contours of a seniority system, simply because those rules are dubbed "seniority" provisions or have some nexus to an arrangement that concededly operates on the basis of seniority.

---

[21] The examples in the text of the types of rules necessary to the operation of a seniority system are not intended to and do not comprise an exhaustive list.

There can be no doubt, for instance, that a threshold requirement for entering a seniority track that took the form of an educational prerequisite would not be part of a "seniority system" within the intendment of § 703 (h).

The application of these principles to the case at hand is straightforward. The Agreement sets out, in relevant part, two parallel seniority ladders. One allocates the benefits due temporary employees; the other identifies the benefits owed permanent employees. The propriety under § 703 (h) of such parallel seniority tracks cannot be doubted after the Court's decision in the *Teamsters* case. The collective-bargaining agreement at issue there allotted one set of benefits according to each employee's total service with the company, and another set according to each employee's service in a particular job category. Just as in that case the separation of seniority tracks did not derogate from the identification of the provisions as a "seniority system" under § 703 (h), so in the present case the fact that the system created by the Agreement establishes two or more seniority ladders does not prevent it from being a "seniority system" within the meaning of that section.

The 45-week rule, correspondingly, serves the needed function of establishing the threshold requirement for entry into the permanent-employee seniority track. As such, it performs the same function as did the employment rule in *Teamsters* that provided that a line driver began to accrue seniority for certain purposes only when he started to work as a line driver, even though he had previously spent years as a city driver for the same employer. In *Teamsters,* the Court expressed no reservation about the propriety of such a threshold rule for § 703 (h) purposes. There is no reason why the 45-week threshold requirement at issue here should be considered any differently.

The 45-week rule does not depart significantly from commonly accepted concepts of "seniority." The rule is not an educational standard, an aptitude or physical test, or a stand-

ard that gives effect to subjectivity. Unlike such criteria, but like any "seniority" rule, the 45-week requirement focuses on length of employment.

Moreover, the rule does not distort the operation of the basic system established by the Agreement, which rewards employment longevity with heightened benefits. A temporary employee's chances of achieving permanent status increase inevitably as his industry employment and seniority accumulate. The temporary employees with the most industry seniority have the first choice of new jobs within the industry available for temporary employees. Similarly, the temporary employees with the most plant seniority have the first choice of temporary employee jobs within their plant and enjoy the greatest security against "bumping" by permanent employees from nearby plants. As a general rule, therefore, the more seniority a temporary employee accumulates, the more likely it is that he will be able to satisfy the 45-week requirement. That the correlation between accumulated industry employment and acquisition of permanent employee status is imperfect does not mean that the 45-week requirement is not a component of the Agreement's seniority system. Under any seniority system, contingencies such as illnesses and layoffs may interrupt the accrual of seniority and delay realization of the advantages dependent upon it.[22]

For these reasons, we conclude that the Court of Appeals was in error in holding that the 45-week rule is not a component of a "seniority system" within the meaning of § 703 (h) of Title VII of the Civil Rights Act of 1964. In the District Court the respondent will remain free to show that, in respect to the 45-week rule or in other respects, the se-

---

[22] There are indications in the record of this case that a long-term decline in the California brewing industry's demand for labor is a reason why the accrual of seniority as a temporary employee has not led more automatically to the acquisition of permanent status. But surely, what would be part of a "seniority system" in an expanding labor market does not become something else in a declining labor market.

niority system established by the Agreement is not "bona fide," or that the differences in employment conditions that it has produced are "the result of an intention to discriminate because of race."

For the reasons stated, the judgment before us is vacated, and the case is remanded to the Court of Appeals for the Ninth Circuit for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL and MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE BLACKMUN join, dissenting.

In the California brewing industry, an employee's rights and benefits are largely dependent on whether he is a "permanent" employee within the meaning of the collective-bargaining agreement. Permanent employees are laid off after all other employees. If laid off at one facility, a permanent employee is permitted to replace the least senior nonpermanent employee at any other covered facility within the local area. Permanent employees are selected before temporary employees to fill vacancies. They have exclusive rights to supplemental unemployment benefits upon layoff and receive higher wages and vacation pay for the same work performed by other employees. Permanent employees have first choice of vacation times, less rigorous requirements for qualifying for holiday pay, exclusive access to veterans' reinstatement and seniority rights, and priority in assignment of overtime work among bottlers.

According to respondent Bryant's complaint, no Negro has ever attained permanent employee status in the California brewing industry.[1]

---

[1] In the present procedural posture of the case, of course, the allegations of the complaint must be accepted as true.

The provision of the collective-bargaining agreement at issue here defines a permanent employee as one "who . . . has completed forty-five weeks of employment . . . in one classification in one calendar year as an employee of the brewing industry in this State." An employee who works 44 weeks per year for his entire working life remains a temporary employee. By contrast, an employee who works 45 weeks in his first year in the industry attains permanent employee status. This simple fact belies the Court's conclusion that the 45-week requirement "does not depart significantly from commonly accepted concepts of 'seniority.'" *Ante,* at 609. Since I am unable to agree that the provision at issue is part of a "seniority system" under § 703 (h) of Title VII, I dissent.

## I

Neither Title VII nor its legislative history provides a comprehensive definition of the term "seniority system."[2] The Court is therefore correct in concluding that the term must be defined by reference to "commonly accepted notions about 'seniority' in industrial relations" and "in the context of Title VII and this country's labor policy." *Ante,* at 605. Those "commonly accepted notions," however, do not lead to the Court's holding today. And I believe that the relevant policies do not support that holding, but instead require that it be rejected.

The concept of "seniority" is not a complicated one. The fundamental principle, as the Court recognizes, *ante,* at 606, is that employee rights and benefits increase with length of service. This principle is reflected in the very definition of the term, as found in dictionaries[3] and treatises and articles in

---

[2] The legislative history does, however, provide a bit more guidance than the Court admits. The fact that the sole example of a seniority system given in the congressional debates is one in which rights increase with cumulative length of service is at least suggestive. See *ante,* at 605, n. 10.

[3] See, *e. g.,* Webster's Third New International Dictionary 2066 (unabridged ed. 1961) ("a status attained by length of continuous service

the field of industrial relations.[4]    To quote from a few of the
sources on which the Court purports to rely today: "Seniority
is a system of employment preference based on length of serv-

(as in a company . . .) to which are attached by custom or prior collective
agreement various rights or privileges"); Random House Dictionary of
the English Language 1299 (1966) ("priority, precedence, or status ob-
tained as the result of a person's length of service"); Black's Law Dictionary
1222 (5th ed. 1979) ("As used with reference to job seniority, worker with
most years of service is first promoted within range of jobs subject to
seniority, and is the last laid off, proceeding so on down the line to the
youngest in point of service"); Ballentine's Law Dictionary 1160 (1969)
("the principle in labor relations that length of employment determines the
order of layoffs, rehirings, and advancements").

[4] See, e. g., Roberts' Dictionary of Industrial Relations 390 (1966)
("The length of service an individual employee has in the plant. . . .   The
seniority principle rests on the assumption that the individuals with the
greatest length of service within the company should be given preference
in employment"); United States Department of Labor, Bureau of Labor
Statistics, Bulletin No. 908–11, p. 1 (1949) ("A seniority program aims
to provide maximum security in employment to those with the longest
service"); E. Dangel & I. Shriber, The Law of Labor Unions § 15 (1941)
("Seniority . . . is an employment advantage in the matter of the choice of
and the right to work in one's occupation on the basis of an employee's
length of service"); BNA, Collective Bargaining Contracts, Techniques of
Negotiation and Administration with Topical Classification of Clauses 488
(1941) ("The term [seniority] refers to length of service with the employer
or in some division of an enterprise"); Meyers, The Analytic Meaning of
Seniority, Industrial Relations Research Association, Proceedings of Eight-
eenth Annual Meeting 194 (1966) ("Seniority is the application of the
criterion of length of service for the calculation of relative equities among
employees"); McCaffrey, Development and Administration of Seniority
Provisions, Proceedings of New York University Second Annual Confer-
ence on Labor 132 (1949) ("seniority may be defined as the length of com-
pany-recognized service as applied to certain employer-employee relation-
ships"); Christenson, Seniority Rights Under Labor Union Working
Agreements, 11 Temp. L. Q. 355 (1937) ("seniority is a rule providing
that employers promote, lay-off and re-employ labor, according to length
of previous service"). Cf. P. Selznick, Law, Society, and Industrial Jus-
tice 203 (1969) (referring to the " 'rather general feeling that a worker
who has spent many years on his job has some stake in that job and in
the business of which it is a part' ").

ice; employees with the longest service are given the greatest job security and the best opportunities for advancement." Aaron, Reflections on the Legal Nature and Enforceability of Seniority Rights, 75 Harv. L. Rev. 1532, 1534 (1962). "The variations and combinations of seniority principles are very great, but in all cases the basic measure is length of service, with preference accorded to the senior worker." Cooper & Sobol, Seniority and Testing under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv. L. Rev. 1598, 1602 (1969). "Seniority grants certain preferential treatment to long-service employees almost at the expense of short-service employees. . . . [S]eniority is defined as length of service." E. Beal, E. Wickersham, & P. Kienast, The Practice of Collective Bargaining 430 (1972).

It is hardly surprising that seniority has uniformly been defined in terms of cumulative length of service. No other definition could accord with the policies underlying the recognition of seniority rights. A seniority system provides an objective standard by which to ascertain employee rights and protections, thus reducing the likelihood of arbitrariness or caprice in employer decisions. At the same time, it promotes stability and certainty among employees, furnishing a predictable method by which to measure future employment position. See, e. g., Sayles, Seniority: An Internal Union Problem, 30 Harv. Bus. Rev. 55 (1952); C. Golden & H. Ruttenberg, The Dynamics of Industrial Democracy 128–131 (1973); Cooper & Sobol, supra, at 1604–1605.

The Court concedes this general point, recognizing that a " 'seniority system' is a scheme that, alone or in tandem with non-'seniority' criteria, allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase." Ante, at 605–606 (footnote omitted). In my view, that concession is dispositive of this case. The principal effect of the 45-week requirement is to ensure that employee rights and benefits in the California

brewing industry are not "ever improving" as length of service increases. Indeed, cumulative length of service is only incidentally relevant to the 45-week rule. The likelihood that a temporary employee will attain permanent employee status is largely unpredictable. The 45-week period, which is exclusive of vacation, leaves of absence, and time lost because of injury or sickness, represents almost 90% of the calendar year. Even if an employee is relatively senior among temporaries, his ability to work 45 weeks in a year will rest in large part on fortuities over which he has no control. The most obvious reason that employees have been prevented from attaining permanent employee status—a reason barely referred to by the Court—is that the brewing industry is a seasonal one. An employee may also be prevented from becoming permanent because of replacement by permanent employees or an employer's unexpected decision to lay off a particular number of employees during the course of a year.[5] It is no wonder that the accrual of seniority by temporary employees has not led with any regularity to the acquisition of permanent employee status.[6] In sum, the 45-week rule does not have

---

[5] Indeed, the agreement expressly provides that a permanent employee laid off at one facility will replace (or "bump") the temporary employee with the lowest *plant* seniority, even if that employee has more industry seniority than others. As a result, temporaries who are relatively senior in terms of industry seniority may have less opportunity to work 45 weeks in a calendar year than temporaries with less industry seniority but more plant seniority. Thus, it is simply not true that temporary employees obtain permanent employee status in order of cumulative length of employment, for the requisite 45 weeks is computed on the basis of service in the industry rather than in particular plants.

[6] The Court acknowledges this point, *ante*, at 610, n. 22, but responds that a system which would fall within § 703 (h) in an expanding labor market does not lose that status by virtue of the fact that the labor market is contracting. In the Court's words, however, the question is whether the 45-week rule is a part of a seniority system because it "allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase." In that context it is

the feature of providing employees with a reasonably certain route by which to measure future employment position. So understood, the 45-week rule has very little to do with seniority, for it makes permanent status turn on fortuities over which the employee has no control, not on length of service with the employer or in the relevant unit.

The Court avoids this conclusion by little more than assertion. It observes that the 45-week rule acts as a threshold requirement for entry onto the seniority track composed of permanent employees, but eliminates the force of that observation with the inevitable concession that such threshold requirements are not necessarily entitled to § 703 (h) exemption.[7] It notes that the 45-week requirement "focuses on length of employment," and proceeds to the unexplained conclusion that it therefore "does not depart significantly from commonly accepted concepts of 'seniority.' " And it adds that more senior temporary employees tend to have a greater opportunity to obtain work and thus to attain permanent status through 45 weeks of employment in a calendar year.

The Court's analysis, of course, is largely dependent on its conclusion that since the 45-week requirement is one measured by time of service, it does not depart from common concepts of seniority. That conclusion, however, is foreclosed by the Court's own definition of a seniority system as one in which employee rights increase with cumulative length of

surely relevant whether the 45-week provision does in fact operate to reward cumulative length of service, or serves instead as a virtually impassable barrier to advancement.

[7] As the Court's own analysis suggests, the 45-week provision is entirely different from the seniority provisions involved in *Teamsters* v. *United States*, 431 U. S. 324 (1977). At issue in that case was a seniority system granting some benefits on the basis of an employee's cumulative length of service with the company, and others on the basis of cumulative length of service in a particular job category. In both cases employee rights and benefits depended on total length of service in the relevant unit, not on the length of service within a calendar year.

service—not length of service within a calendar year. The mere fact that the 45-week rule is in some sense a measure of "time" does not demonstrate a valid relation to concepts of seniority. Such a conclusion would make the § 703 (h) exemption applicable to a rule under which permanent employee status is dependent on number of days served within a week, or hours served within a day.[8]

Nor is there much force to the suggestion that the 45-week requirement somehow becomes part of a seniority system because permanent employee status is more easily achieved by the more senior temporary employees. I could agree with the Court's decision if petitioners demonstrated that the collective-bargaining agreement actually operates to reward employees in order of cumulative length of service. But at this stage of the litigation there is no evidence that temporary employees attain permanent status in a way correlating even roughly with total length of employment. The mere possibility that senior temporary employees are more likely to work for 45 weeks is, in my view, insufficient.[9] It might as well be said that a law conditioning permanent employee status on the attainment of a certain level of skill is a "seniority" provision since skills tend to increase with length of service. A temporary employee is always subject to a risk that for some reason

---

[8] For example, there can be no serious question that a provision making permanent status dependent on 7 days of work per week, or 12 hours per day, would not be part of a "seniority system" within the meaning of § 703 (h).

[9] I could understand, although I do not favor, a decision remanding this case for factual findings on the question whether temporary employees in fact acquire permanent status and, if so, whether they do so in order of cumulative length of service. In my view, it is extraordinary for the Court to conclude, in a factual vacuum and on the authority of nothing other than petitioners' word, that "the rule does not distort the operation of the basic system established by the Agreement, which rewards employment longevity with heightened benefits." See also n. 5, *supra*.

beyond his control, he will be unable to work the full 45 weeks and be forced to start over again.

## II

Since the 45-week rule operates as a threshold requirement with no relation to principles of seniority, I believe that the rule is for analytical purposes no different from an educational standard or physical test which, as the Court indicates, is plainly not entitled to § 703 (h) exemption. Accordingly, I think it clear that the 45-week requirement is not part of a "seniority system" within the meaning of § 703 (h). But if the question were perceived to be close, I would be guided by the familiar principle that exemptions to remedial statutes should be construed narrowly. "To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people." *Phillips Co.* v. *Walling,* 324 U. S. 490, 493 (1945). See, *e. g., Group Life & Health Ins. Co.* v. *Royal Drug Co.,* 440 U. S. 205, 231 (1979); *Abbott Laboratories* v. *Portland Retail Druggists Assn.,* 425 U. S. 1, 12 (1976); *Peyton* v. *Rowe,* 391 U. S. 54, 65 (1968). The effect of § 703 (h) is to exempt seniority systems from the general prohibition on practices which perpetuate the effects of racial discrimination. This exception is a limited one in derogation of the overarching purpose of Title VII, "the integration of blacks into the mainstream of American society," *Steelworkers* v. *Weber,* 443 U. S. 193, 202 (1979). A statute designed to remedy the national disgrace of discrimination in employment should be interpreted generously to comport with its primary purpose; exemptions should be construed narrowly so as not to undermine the effect of the general prohibition. Today the Court not only refuses to apply this familiar principle of statutory construction, it does not even acknowledge it.

In my view, the Court's holding is fundamentally at odds with the purposes of Title VII and the basic function of the § 703 (h) exemption.   I dissent.[10]

---

[10] To decide this case we are not required to offer a complete definition of the term "seniority system" within the meaning of § 703 (h).   Nor are we called upon to canvass and evaluate rules "ancillary" to seniority systems.   The question whether all of the rules listed by the Court, *ante,* at 607, nn. 17–20, are part of a seniority system is not at all easy, and the Court's own reasoning demonstrates that its discussion of those rules is gratuitous and does little to advance analysis of the 45-week requirement. That requirement serves none of the functions of an "ancillary" rule.